IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Dawn Considine-Brechon, et al., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 C 50133 |
| | ) | |
| vs. | ) | |
| | ) | |
| Dixon Public School District # 170, et al., | ) | Judge Philip G. Reinhard |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons stated below, the motions [21] [23] of the School Defendants and Banks to dismiss the federal claims are granted. Counts II, III, IV, and V.1 are dismissed without prejudice. The court declines to exercise supplemental jurisdiction over the remaining state law claims and they are dismissed without prejudice as well. Plaintiffs may file an amended complaint on or before July 14. 2017.

## STATEMENT-OPINION

Plaintiff, Dawn Considine-Brechon ("Dawn"), brings this action, both in her individual capacity and as the legally appointed plenary guardian of the person and estate of her adopted daughter, Stevielyn Considine a/k/a Cyndel Considine ("SCC"), a disabled person.[1] In the amended complaint [13], Dixon Public School District # 170 Board of Education, Dixon Public School District # 170 ("District"), Lee County Special Education Board of Directors, Lee County Special Education Association ("LCSEA"), and Amanda Banks, Corena Steinmeyer, Susan Stastny, Nancy Kane, Margo Empen and Michael Juenger (all in their individual capacities) are named as defendants. The "Unknown Employer of Amanda Banks" is also named as a defendant.[2]

---

[1] Dawn was issued letters of office by an Illinois state court on May 10, 2016 appointing her the plenary guardian of the person and estate of SCC.

[2] Appearances have been entered by all named defendants except Dixon Public School District # 170 Board of Education, Lee County Special Education Board of Directors, and the Unknown Employer of Amanda Banks. The docket sheet shows no service on or waiver of service by these three named defendants. The initial joint status report [10] indicates all defendants (other than Amanda Banks who subsequently entered her appearance) had been served as of the filing of the initial joint status report. The court concludes from this that the parties consider "Dixon Public School District # 170" and "Dixon Public School District # 170 Board of Education" to be different names describing the same entity and

1

The amended complaint originally contained a Count I alleging claims for violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA"). Plaintiffs, the District and the LCSEA settled these IDEA claims and a stipulated order [17] was entered dismissing the Count I claims with prejudice.

The remaining counts are as follows: Count II is a Section 1983 action asserting Fourteenth Amendment violations against all defendants; Count III is a Section 1983 action asserting Fourteenth Amendment violations against the District and the LCSEA; Count IV asserts violations of section 504 of the Rehabilitation Act (29 U.S.C. § 701 et seq.); Count V.1[3] asserts violations of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) against the District and the LCSEA; Count V.2 asserts a state law claim for professional negligence against Banks, Steinmeyer, the District and the LCSEA; Count VI is a state law claim for intentional infliction of emotional distress against all defendants; Count VII is a state law claim for reckless infliction of emotional distress against all defendants; and Count VIII is a state law false imprisonment claim against Banks, Kane, Stastny, Steinmeyer, the District and the LCSEA.

Banks moves [21] to dismiss Counts II, V.2, VII and VIII for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), and the District, the LCSEA, Steinmeyer, Stastny, Kane, Empen and Juenger ("School Defendants") move [23] to dismiss all claims against them pursuant to Rule 12(b)(6).

The following facts are taken from the allegations in the amended complaint. SCC was 21 years of age when this action was commenced on May 16, 2016. From 2010-2015 she attended Dixon High School. In 2011 SCC was evaluated by defendant LCSEA and identified as a student in need of special education services with diagnoses of Attention Deficit Hyperactivity Disorder, Bipolar Disorder, Reactive Attachment Disorder, Oppositional Defiant Disorder, a learning disability, and a history of Factitious Disorder by Proxy. Banks is a special education and related services provider (speech therapist) for the District and/or LCSEA. Stastny is a special education teacher for the District and/or LCSEA. Kane is a special education paraprofessional for the District and/or LCSEA. Steinmeyer is the director of LCSEA and supervised Banks, Stastny and Kane. Juenger was the superintendent of the District prior to the 2015-16 school year. Empen was the assistant superintendent during that period and the superintendent during the 2015-16 school year. Each of the individually named defendants was involved in providing direct services to SCC.

At all times relevant, each of the defendants had specific knowledge that SCC "had mental health and educational issues which affected her judgment and decision-making, caused her to have a tendency to manipulate adults, and convey falsehoods, and which required a high

---

that likewise "Lee County Special Education Association" and "Lee County Special Education Board of Directors" are considered by the parties to be different names describing the same entity. Having never been identified or served, the Unknown Employer of Amanda Banks is not a party to this action.

[3] The amended complaint contains two counts identified as Count V. The court adopts the parties' approach and will refer to the first Count V as V.1 and the second as V.2.

level of care with consistency and structure and that such care would require a lifelong commitment by a caregiver." At school, SCC was subject to the control of teachers and administrators, and because of their influence SCC had no choice but to comply with the "policies, edicts, commands and suggestive statements of said teachers, administrative professionals and all defendants." Banks, Kane, Stastny and Steinmeyer sought to retaliate against Dawn "who had been such a strong advocate for [SCC] and her other children." Despite numerous medical, psychological and health professionals providing documentation of SCC's emotional and cognitive issues "defendants took deliberate and intentional actions" against SCC's best interest "which defied parental requests and concerns." Banks, Empen, Kane, Stastny, and Steinmeyer coerced, bribed, influenced and intimidated SCC into signing a document rescinding Dawn's right to make educational decisions for SCC and depriving Dawn of any notice of when those decisions were made. These defendants accomplished these actions by "surreptitiously promising, informing, notifying [SCC] that she did not have to complete her overdue homework, attend school anymore, could live in a home with fewer rules, could have sugar products whenever she wanted, did not have to take her physician-prescribed medications, and could immediately graduate from high school." The defendants' actions "displayed deliberate indifference to [SCC's] significant disabilities by depriving her of the advice, knowledge, and protection of her educational designee, Dawn, requiring [SCC] to actively waive her right to that protection, to encourage her to leave school, before she was prepared to do so, driving her away from school and away from her safe secure home with Dawn, and providing her homes to live in that created a danger to her of being physically left unprotected." Plaintiffs allege this left SCC significantly more vulnerable to the physical and emotional assault which they allege did occur during the time SCC was living with Banks.

Banks, during the 2014-15 school year and the summer of 2015, pressured SCC on many occasions by asking inappropriate questions about her home life. Banks pressured SCC and assisted her in revoking Dawn's educational rights as to SCC's Individualized Education Program ("IEP") and called an IEP meeting without Dawn present where IEP services were terminated and it was determined SCC would graduate from high school and receive a diploma without notice to Dawn. Banks influenced and assisted SCC in writing a letter to her treating psychiatrist stating Dawn no longer had any rights related to SCC and "accusing Dawn of a number of atrocities." Banks influenced and assisted SCC in signing Social Security applications and convinced SCC to come and live with Banks and her husband.

Banks convinced SCC to revoke powers of attorney on file at KSB Hospital and Medical Group, to remove family members from Facebook and block them, and told SCC not to make contact with her family members. Banks influenced and assisted SCC in calling adult protective services and instructed SCC to report there was inadequate food in Dawn's home. Banks restrained SCC for six weeks keeping SCC from returning to Dawn's home. During this time SCC was not given her medication and encouraged by Banks not to take her prescribed medication.

While SCC was still living with Dawn, Stastny told SCC she could come live with Stastny if she did not like it at home and each day repeated her phone number to SCC and told

her to remember it.  Stastny went with SCC to SCC's sister's place of employment and said she would attempt to get the sister to move out of Dawn's house as well.  Stastny persuaded and coerced SCC to run away from home, made arrangements for SCC to stay away from Dawn's home for multiple nights, paid SCC money and had her spend the night at Stastny's house.  Stastny, with Banks, worked to prevent Dawn from locating SCC by telling SCC not to go to Whiteside to school as Dawn might appear there to see her.

Kane likewise encouraged SCC to move permanently out of Dawn's house.  Along with Stastny and Banks, Kane convinced SCC to forfeit any future educational services available to her under the IDEA without giving notice to Dawn, SCC's father or educational advocate.

Steinmeyer failed to intervene though she was aware of the actions of the defendants described in the preceding paragraphs, refused to inform Dawn of SCC's location when asked, directly contradicted Dawn's wishes regarding SCC's intake of sugar products, failed to notify Dawn in advance of an IEP meeting where SCC's programming was changed thus denying Dawn an opportunity to participate in the meeting.

After plaintiffs filed this action, plaintiffs, District, and LCSEA entered a certain Settlement Agreement And Specific Release of Claims effective August 1, 2016 ("Agreement").  In the Agreement, the parties agreed "that this Agreement fully and finally settles all issues relating to the provision of services by the District to [SCC] under IDEA."  The Agreement provided that plaintiffs "hereby release, waive and discharge any and all claims relating to the appropriateness of services provided to [SCC] in her IEP against the District and LCSEA, their boards, their members, individually and jointly, and their predecessors, successors, heirs and assigns, and the District's and LCSEA's past, present, and future administrators, officers, employees, and agents arising out of or relating to [SCC's] IEP programing at the District through and including the date of this Agreement.  This Specific Release of Claims includes, and is limited to the appropriateness of [SCC's] IEP and claims under Article 14 of the Illinois *School Code* as it pertains to IDEA, and the *Individuals with Disabilities Education Act*, including attorney's fees, but does not include claims to enforce the terms of this Agreement."  In the Agreement, Dawn agreed to withdraw with prejudice her due process complaint which was pending with the Illinois State Board of Education ("ISBE").  The ISBE due process complaint disputed "the appropriateness of services offered in [SCC]'s Individualized Education Program."

School Defendants argue the Agreement bars plaintiffs' federal claims against them because the federal claims are all actually claims for the denial of a free appropriate public education ("FAPE") which can only be brought under the IDEA and the Agreement settled all IDEA claims.  Plaintiffs contend the remaining federal claims do not seek a remedy for the denial of a FAPE, are not brought under the IDEA and, therefore, were not settled and are not barred by the Agreement.

It is clear from the language of the Agreement that the parties to the Agreement intended to settle "all issues relating to the provision of services by the District to [SCC] under the

4

IDEA." "A settlement agreement is a contract and as such, the construction and enforcement of settlement agreements are governed by principles of local law applicable to contracts generally. In Illinois, a court's duty in construing a settlement agreement is to effectuate the intent of the parties to the agreement." Hillshire Brand Co. v. Travelers Casualty & Surety Co., No. 15 C 06859, 2016 WL 6892885, * 2 (N.D. Ill. Nov. 23, 2016) (Tharp, J.) (citations and internal quotation marks omitted). Since the parties clearly intended to settle all of plaintiffs' claims brought under the IDEA, the court must determine the scope of relief available to plaintiffs under the IDEA and whether the relief plaintiffs now seek in this action falls outside that scope.

In Fry v. Napoleon Community Schools, __ U.S. __, 137 S.Ct. 743 (2017), the United States Supreme Court recently addressed 20 U.S.C. § 1415(l), which is the rule of construction provision of the IDEA. The Supreme Court quoted § 1415(l) as follows:
> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], title V of the Rehabilitation Act [including § 504], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

Fry v. Napoleon Community Schools, __ U.S. __, 137 S.Ct. 743, 750 (2017). The Court examined the IDEA and held that the only relief available under the IDEA is relief from the denial of a FAPE. Id., at 752. Therefore, the Court held that the exhaustion provision of 20 U.S.C. § 1415(l) only comes into play when plaintiff's suit seeks relief for the denial of a FAPE. Id. Otherwise, plaintiff has no obligation to exhaust the IDEA's administrative procedures under the IDEA "even when the suit arises directly from a school's treatment of a child with a disability – and so could be said to relate in some way to her education." Id., at 754.

In determining whether a suit seeks relief for denial of a FAPE, a court should look to the substance, or gravamen, of the plaintiff's complaint. Id., at 755. "The IDEA, of course, protects only 'children' (well, really, adolescents too) and concerns only their schooling." Id. The IDEA's "goal is to provide each child with meaningful access to education by offering individualized instruction and related services appropriate to her 'unique needs'." Id. "Title II of the ADA and § 504 of the Rehabilitation Act cover people with disabilities of all ages, and do so both inside and outside schools." Id., at 756. "In short, the IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-discriminatory access to public institutions." Id. "The same conduct might violate all three statutes" and "a plaintiff might seek relief for the denial of a FAPE under Title II and § 504 as well as the IDEA." Id. However, a child in a school could instead bring a complaint under Title II and § 504 which only seeks "relief for simple discrimination, irrespective of the IDEA's FAPE obligation." Id.

In light of Fry, the question that needs to be answered here is whether, after the settlement and dismissal by SCC and Dawn of their IDEA claims, their complaint plausibly

5

alleges claims which only seek "relief for simple discrimination, irrespective of the IDEA's FAPE obligation." Id.

Counts IV and V.1 of the complaint are brought against the District and the LCSEA. Count IV is pursuant to Section 504 of the Rehabilitation Act and Count V.1 is pursuant to Title II of the ADA. Under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. 12132.

Plaintiffs specifically allege in Count IV (after incorporating all of the complaint's previous allegations by reference) that District and LCSEA "deliberately kept Dawn from participating in special education meetings and educational decisions by providing no notice of the same and forcing, coercing, pressuring, bribing, and demanding that [SCC] revoke a delegation of rights which resulted in severe neglect and physical, psychological, and emotional harm to [SCC], caused educational loss to [SCC], denied her right to free appropriate public education, and caused economic loss, psychological damage, and emotional distress to [SCC] and Dawn. Count IV also specifically alleges "District and LCSEA, retaliated against [SCC] and Dawn for asserting [SCC]'s educational rights by their essential denial of the same and caused educational loss to [SCC] and denied her right to free and appropriate public education and caused economic loss and emotional distress to [SCC] and Dawn."

Count V.1, after incorporating all of the complaint's prior allegations by reference, specifically alleges "District and LCSEA, intentionally and/or willfully and wantonly violated [SCC]'s rights under the [ADA] by retaliating against [SCC] because of her disabilities and by failing to provide her access to a free and appropriate public education in the ways described herein."

As noted above, the Agreement was clearly intended by the parties to settle all of plaintiffs' claims under the IDEA. Any claims relating to the denial of a free appropriate public education to SCC have therefore been settled. The allegations specifically set forth in Count IV go only to an alleged IDEA violation. The allegations assert the District and LCSEA took actions to keep Dawn from participating in SCC's special education process by forcing SCC to revoke the delegation of rights SCC had given to Dawn under the IDEA. That delegation gave Dawn the power to act for SCC in pursuing her rights under the IDEA after SCC attained majority. The revocation took that power away from Dawn and returned it to SCC. The complaint alleges this revocation resulted in harm to SCC and Dawn. The allegation in Count V.1 specifically alleges the ADA violation is failing to provide SCC with a FAPE. Count V.1 also alleges the District and LCSEA retaliated against SCC because of her disabilities. However, there are no allegations as to how she was retaliated against or subjected to discrimination beyond actions related to her right to a FAPE.

6

Looking at the allegations in the complaint as a whole (the allegations incorporated by reference into Counts IV and V.1), none of the facts alleged support an ADA or Section 504 claim. Apart from allegations that go to IDEA violations, plaintiffs' are complaining about the actions of various defendants which led to SCC moving out of Dawn's home and in with Banks and the resultant injuries SCC and Dawn suffered from these actions. None of these allegations go to an exclusion from the participation in, the denial of the benefits of, or subjection to discrimination under any program or activity receiving Federal financial assistance or by any public entity. The Section 504 and ADA claims asserted in Count IV and Count V.1 have been settled to the extent they seek relief for the denial of a FAPE. The allegations that seek relief for other actions taken by defendants fail to state claims within the scope of Section 504 or the ADA. Counts IV and V.1 must be dismissed.

Counts II and III are Section 1983 actions claiming violation of the Fourteenth Amendment to the United States Constitution. Count II alleges all defendants violated SCC's liberty interest by removing her "from the school premises in the car of one of the defendants" and by hiding the location of SCC from Dawn for a period of approximately six weeks. Count II also alleges the termination of SCC's educational programming, revocation of Dawn's parental rights, and coercion of SCC to make "multiple false reports about Dawn." It asserts the defendants either took or allowed others to take "harmful, discriminatory and unconstitutional actions against [SCC] and Dawn by retaliating against Dawn for her strong advocacy for [SCC] and her other children at District schools." Count II also asserts an equal protection violation because SCC "was entitled to a free and appropriate public education just like other non-disabled peers."

As with the Section 504 and ADA claims discussed above, the allegations concerning termination of educational programs, revocation of parental rights, retaliation for pursuing SCC's educational rights all go the denial of a FAPE and, therefore, have been settled per the Agreement. The alleged equal protection violation, that SCC was entitled to a free and appropriate public education likewise was settled per the Agreement because it is expressly a claimed denial of a FAPE.

The remaining Count II allegations concern the actions of defendants in inducing SCC to move out of Dawn's home and in with Banks, the consequences to plaintiffs of that move, as well as other actions taken to sever SCC's mother-daughter relationship with Dawn. Plaintiffs' brief nicely sums up their allegations when it states: "The Plaintiffs allege the Defendants knew S.C.C. was disabled and deliberately conspired to use their positions of influence and control as educators to coerce her to separate her from her family." Dkt # 29.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." L.P. v. Marian Catholic High School, 852 F.3d 690, 696 (7th Cir. 2017) (internal quotation marks and citation omitted). Plaintiffs advance a violation of the Fourteenth Amendment's Due Process Clause. The Due Process Clause of the Fourteenth Amendment not only guarantees fair process but also was intended to

7

prevent government officials from abusing their power. County of Sacramento v, Lewis, 523 U.S. 833, 840 (1998). When the alleged abuse is of executive, rather than legislative, power, the abuse must rise to a level that "shocks the conscience". Id., at 846.

In support of their motions to dismiss, Banks and the School Defendants argue none of the alleged conduct of the defendants was taken "under color of state law." "[A]ction is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law. The mere assertion that one is a state officer does not necessarily mean that one acts under color of state law. A state officer's conduct does not constitute acting under color of state law unless it is related in some way to the performance of the duties of the state office." Wilson v. Price, 624 F.3d 389, 392 (7th Cir. 2010) (internal quotation marks and citations omitted).

The non-IDEA related allegations go to actions taken by defendants to persuade, induce or coerce SCC to move out of Dawn's house and in with Banks. They allege defendants convinced SCC to take certain actions detrimental to her well being (not taking her prescribed medication, moving to a place where she was placed in danger.) They allege defendants took advantage of their knowledge of SCC's disabilities to induce her to take these actions and to make certain allegations about Dawn. At the time these alleged actions occurred, SCC was an adult and legally able to make the decisions she made. It was not until six days before this lawsuit was commenced that a guardian of the person and estate, Dawn, was appointed for SCC by the state court. This was well after the alleged actions occurred.

The defendants were all school employees or, in the case of Banks, worked at the school. It is through their working at the school that they met SCC, learned of her disabilities and developed relationships with her. However, the allegations of defendants' conduct are not "related in some way to the performance of the duties of [their] state office." Id. The defendants served as a teacher, a paraprofessional, administrators and a speech therapist. None of the non-IDEA related allegations have anything to do with the duties of the defendants' positions in the school. Plaintiffs do not cite, nor did the court find, any authority holding that actions taken by a school worker are considered to be taken under color of state law, when those actions involve an adult special education student, but are not related to school-related services. This is not a case where it is alleged a minor child was "removed" by an employee of a state child welfare agency from the child's home and "placed" with Banks where such an employee's official duties concern taking these sorts of actions. "Removal" and "placement" were not duties in any way related to the defendants' official duties.

The alleged actions also do not rise to the level of shocking the conscience. The "due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." Lewis, 523 U.S. at 848. The "Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the States." Id. (internal quotation marks and citation omitted.) The Constitution "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." Id. (internal quotation marks

8

and citation omitted). "Lewis calls for judicial modesty in implementing a federal program of constitutional torts that lie outside any specific clause of the Constitution." Christensen v. County of Boone, 483 F.3d 454, 464 (7th Cir. 2007). "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability." Daniels v. Williams, 474 U.S. 327, 332 (1986).

The non-IDEA related allegations include: telling SCC she could live in a home with fewer rules, did not have to take her physician-prescribed medications, assisting SCC in writing to her psychiatrist stating Dawn no longer had any rights related to SCC and "accusing Dawn of a number of atrocities", assisting [SCC] with Social Security applications, convincing [SCC] to live with Banks, leaving [SCC] unsupervised which resulted in her being placed in dangerous situations which resulted in physical, emotional and psychological harm to [SCC]."

The essence of these allegations is that defendants induced SCC to exercise rights SCC legally possessed. Exercising these rights may well not have been in SCC's best interest, but they were rights that belonged to her. Bringing these claims within the scope of Fourteenth Amendment substantive due process would require expanding substantive due process beyond its existing intentionally narrow limits.

The complaint, in addition to alleging defendants induced SCC to move out of Dawn's home, also uses language ("restraining and false imprisoning") which would indicate something beyond convincing SCC to move out. However, "false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official." Baker v. McCollan, 443 U.S. 137, 146 (1979). The remedy for false imprisonment is under state tort law. Id.

There is a presumption in favor of granting plaintiffs at least one opportunity to file an amended complaint after the original complaint is dismissed. Runnion v. Girl Scouts of Greater Chicago, 786 F.3d 510, 518 (7th Cir. 2015). In the time since plaintiffs filed the complaint which is the subject of the motions to dismiss decided today, both the Settlement Agreement and the Supreme Court's decision in Fry have intervened. Given these intervening events, and this court's decision today, plaintiffs will be given an opportunity to assess their position and, if they wish, file an amended complaint alleging a federal claim or claims.[4] Alternatively, plaintiffs may decide to pursue any state law claims they have in state court.

For the foregoing reasons, the motions [21] [23] of the School Defendants and Banks to dismiss the federal claims are granted. Counts II, III, IV, and V.1 are dismissed without prejudice. The court declines to exercise supplemental jurisdiction over the remaining state law

---

[4] Of course, plaintiffs may also invoke this court's supplemental jurisdiction and plead state law claims as well if they choose to file an amended complaint.

9

claims and they are dismissed without prejudice as well. Plaintiffs may file an amended complaint on or before July 14. 2017.

Date: 6/08/2017                ENTER:

*Philip G. Reinhard*
United States District Court Judge

Electronic Notices. (LC)